## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| AMANDA KULA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cause No.: |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| CITY OF PEVELY, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT FOR SEX DISCRIMINATION IN VIOLATION
### OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

COMES NOW Plaintiff, by and through counsel, and for her claim against Defendant states as follows:

### PARTIES AND JURISDICTION

1.      At all times herein mentioned, Plaintiff, Amanda Kula ("Plaintiff" or "Officer Kula"), is a female citizen of the United States and was employed within Jefferson County, Missouri.

2.      Defendant, City of Pevely, Missouri ("Defendant" or "City"), is a municipal and public entity located within the U.S. District Court for the Eastern District of Missouri. Defendant operates the Pevely Police Department ("Department").

3.      This Court has federal question jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1343, as well as 42 U.S.C. §2000e-5.

4.      This Court has personal jurisdiction over the Plaintiff, who worked within the boundaries of the U.S. District Court for the Eastern District of Missouri.

5.      The Defendant is subject to personal jurisdiction within the U.S. District Court for the Eastern District of Missouri and the events that give rise to this action occurred within the

1

boundaries of the U.S. District Court for the Eastern District of Missouri and, pursuant to 28 U.S.C. §1391, the U.S. District Court for the Eastern District of Missouri is the proper venue.

## COMMON FACTUAL ALLEGATIONS

6.      On or about September 15, 2014, Plaintiff began her employment with the Defendant as a reserve police officer for the Department.

7.      On or about September 15, 2015, Plaintiff was hired as a full-time police officer for the Department.

8.      On or about December 5, 2017, Plaintiff left work early because her son was ill. Sergeant Gregory Long ("Sgt. Long") texted and told Plaintiff to acquire a doctor's note because then Captain Tony Moutray ("Capt. Moutray") asked for it. Usually, the Department did not ask for a doctor's note unless an employee missed more than three (3) consecutive days. Further, two weeks prior, then Officer Ryan Watson ("Off. Watson") left work early to take his son to a doctor's appointment and was not required to provide a doctor's note.

9.      On or about February 7, 2018, Plaintiff discussed a pay issue with then Capt. Moutray and also asked why Off. Watson was allowed to bring his patrol car home with him to Eureka, MO, which was outside the Department's fifteen (15) mile radius policy for a take home patrol car. Plaintiff, at the time, lived in Affton, MO, which was seventeen (17) miles from the City limits and was denied a take home patrol car.

10.      On or about February 17, 2018, Corporal Ben Litterall ("Cpl. Litterall"), Plaintiff's immediate supervisor, issued her a written reprimand allegedly due to her "argumentative" and "insubordinate" attitude. He called Plaintiff a "cry baby" and told her to toughen up. Cpl. Litterall also said if she went to Human Resources ("HR") to complain about how he treated her, other officers would look at her as "one of those people" that runs to HR.

11.     On or about March 2, 2018, then Capt. Moutray told Plaintiff to meet him at the city park to discuss the written reprimand she received on or about February 17, 2018. Once there, he informed Plaintiff that the disciplinary paperwork from Cpl. Litterall would not be placed in her file and that Cpl. Litterall would receive training.

12.     On or about April 9, 2018, then Capt. Moutray was promoted to the Chief position of the Department (hereinafter referred to as "Chief Moutray").

13.     On or about May 7, 2018, Off. Watson was promoted to a corporal position of the department (hereinafter referred to as "Cpl. Watson"), and Cpl. Litterall was promoted to a sergeant position (hereinafter referred to as "Sgt. Litterall").

14.     On or about May 16, 2018, Plaintiff sent Cpl. Watson a memorandum stating the pay raise she was granted was not reflected on her previous paycheck. Cpl. Watson forwarded the memo to Captain Larry Miller ("Capt. Miller"). Subsequently, Plaintiff was advised by Capt. Miller that the raise would show up on her paycheck soon.

15.     On or about May 22, 2018, Plaintiff was finishing up her reports before leaving for vacation the next day. Plaintiff was a bit behind but was told by Sgt. Long to "get done what you can." Sgt. Long also gave Plaintiff permission to leave one (1) hour early so she could pick her son up at school.

16.     On or about May 23, 2018, after complaining to then Capt. Moutray around February 7, 2018 about new hires making more than her, Plaintiff received a pay raise from $17.33 per hour to $18.00 per hour.

17.     On or about June 4, 2018, Plaintiff returned from her vacation and was written up by Cpl. Watson for not finishing her reports and not following the chain of command. Plaintiff had her patrol car taken away and was also suspended from working a traffic grant, which she depended

on for supplemental income.

18.     On or about June 28, 2018, Plaintiff requested to be excused from working the City's movie night on July 14, 2018 because her partner's sister was getting married that evening.

19.     On or about July 2, 2018, because the City planned a movie night at the park on July 14, 2018 and her attendance was allegedly mandatory, Plaintiff was told that she needed to provide documentation of her partner's sister's wedding that they were to attend on her scheduled day off. Two male officers, Tim Schiele and Joe St. Clair ("Off. St. Clair"), could not attend the movie night for various reasons and were not asked to provide documented proof of their whereabouts.

20.     On or about July 3, 2018, Plaintiff forwarded Capt. Miller the requested documentation of her partner's sister's wedding. Included in her email correspondence was a forwarded message from her partner.

21.     On or about July 3, 2018, Chief Moutray responded to the documentation Plaintiff's partner provided about the wedding and to Plaintiff's partner's response to Chief Moutray's request. He told Plaintiff's partner there was no policy stating when the Department could request further documentation for requested days off and assured her his request was not "discriminatory" or "intrusive."

22.     On or about July 4, 2018, Plaintiff's partner responded to Chief Moutray saying, she felt he was signaling out Plaintiff and discriminating against her because she was a female.

23.     On or about July 30, 2018, Plaintiff went on medical leave for a foot injury and subsequently was informed she was pregnant.

24.     On or about August 1, 2018, while Plaintiff was on medical leave, fellow officers advised Plaintiff that her belongings, both personal and Department issued, had been piled up in

4

the patrol room, unsecured, and her patrol vehicle had been reassigned to another officer. Two other male Department employees, Corporal Steve Coon and Officer Dean Rodgers, had previously been on medical leave and neither had their patrol vehicle reassigned.

25.     On or about August 20, 2018, Plaintiff returned to work on a light duty basis and advised the Department about her pregnancy.

26.     On or about August 23, 2018, Plaintiff was issued a written reprimand for: inefficiency in the use of time and in the performance of duties, unexcused tardiness, failure to follow verbal or written instructions, and failure to carry and maintain official department equipment. Chief Moutray advised Capt. Miller and Sgt. Long not to provide Plaintiff with documentation regarding the basis for the written reprimand. Plaintiff attempted to appeal this written reprimand numerous times to Capt. Miller but was consistently told the paperwork was not done yet.

27.     On or about September 11, 2018, Plaintiff suffered a miscarriage and subsequently went out on medical leave to recover for nearly eight (8) weeks.

28.     On or about October 31, 2018, Cpl. Watson, while at the police station, yelled "I can't wait to fire that dyke bitch" to Off. St. Clair, Detective Corporal Brian Benjamin ("Det. Cpl. Benjamin"), and others in the hallway. Cpl. Watson was apparently upset he had to work on Halloween to cover Plaintiff's shift while she was out on medical leave because of her miscarriage.

29.     On or about November 5, 2018, Plaintiff returned to work from her medical leave.

30.     Subsequently, on or about November 5, 2018, Plaintiff was informed that Cpl. Watson told others he believed Plaintiff made up the pregnancy and that he wanted to fire her because he had to cover for her while she was on medical leave because of her pregnancy.

31.     Later, on or about November 5, 2018, Plaintiff was called into a meeting with Capt.

Miller and Det. Cpl. Benjamin and asked about a previous sexual encounter she had with Sgt. Litterall. Plaintiff advised them the encounter occurred in or around December 2016. Plaintiff told them it was consensual but that afterwards Sgt. Litterall told her she "just [hasn't] found the right man yet." Plaintiff advised them she believed the encounter and Sgt. Litterall's remark affected his role as her supervisor and treatment towards her. Further, Cpl. Watson brought this to the command staff's attention after Dispatcher Jessica Richter told him about it on or about October 31, 2018, which was when he stated that he wanted to fire Plaintiff.

32.     Also on or about November 5, 2018, Plaintiff was made aware that on November 29, 2018, Department personnel would be taking pictures in their dress uniforms.

33.     On or about November 15, 2018, Plaintiff was called into a meeting with Chief Moutray and Cpl. Watson. Plaintiff was accused of purposefully delaying a report and hiding out at the firehouse. Plaintiff was then banned from the firehouse, which no other officers had been banned from.

34.     On or about November 19, 2018, Plaintiff was written up for being involved in a pursuit just outside the City limits. Sgt. Litterall and Cpl. Watson, however, had both previously violated the pursuit policy and were not reprimanded.

35.     On or about November 29, 2018, Department photos were being taken in dress uniforms. Plaintiff had tried her dress uniform on a few weeks earlier, and it fit her fine. On picture day, however, the waistband of her pants was too tight due to hormonal levels related to her pregnancy. Plaintiff advised her supervisor that with her miscarriage, hormone issues, and possibly being pregnant again, she could not fit in her uniform.

36.     While attempting to get dressed on or about November 29, 2018, Plaintiff was dispatched and responded to a vehicle accident to backup Cpl. Watson, who was already on scene.

Cpl. Watson told Plaintiff to interview the witnesses because he was conducting the investigation. Plaintiff, without knowledge of Cpl. Watson's investigation, was told by Cpl. Watson to write the report. Plaintiff expressed her concern that she did not have the details about the accident to complete a report, which caused Cpl. Watson to get extremely agitated, raise his voice, and say he would do the report.

37.     After returning back to the station from the call on or about November 29, 2018, Capt. Miller took Plaintiff to the men's locker room and gave her a men's pair of pants that were roughly six inches too long. After getting the replacement uniform on, Plaintiff was told to go home. Plaintiff asked why she was being told to go home and was yelled at by Chief Moutray. Plaintiff allegedly received a written reprimand for this incident but was not told about it until after her termination. Off. St. Clair also missed the pictures because of a medical issue but was not reprimanded.

38.     On or about December 3, 2018, Cpl. Watson told Plaintiff to write the report for the accident on or about November 29, 2018. Plaintiff again told Cpl. Watson that she did not have enough information because she did not conduct the investigation into the accident, which again caused Cpl. Watson to get agitated at Plaintiff. Cpl. Watson then told other officers that Plaintiff had a bad work ethic.

39.     Later, on or about December 3, 2018, Plaintiff reported the incident with Cpl. Watson to Sgt. Long. Sgt. Long told her nothing was going to change and that if Plaintiff filed an official complaint against Cpl. Watson it would just make the whole situation worse.

40.     On or about December 4, 2018, after roll call, Sgt. Long held Cpl. Watson and Plaintiff back to discuss the report writing issue. Cpl. Watson immediately got hostile, told Plaintiff not to talk to him and said, "I shouldn't have to hold her hand." The meeting turned into a

screaming match between Sgt. Long and Cpl. Watson and culminated with Cpl. Watson saying "I'm not touching that fucking report" before slamming the door on his way out.

41.    On or about December 6, 2018, Plaintiff received a phone call that an alderman had advised a friend to call Plaintiff and tell her they overheard Chief Moutray and an alderman say they were "going to bring down the hammer on me."

42.    On or about December 12, 2018, the City's Board of Aldermen held a meeting and voted to terminate Plaintiff's employment with the Defendant. At the time, Plaintiff was given no reason for her termination. Also at this meeting, The Board of Alderman voted to hire Officer Nathan Corley ("Off. Corley"). Off. Corley did not go through the formal hiring process for the Department.

43.    On or about December 19, 2018, Plaintiff's attorney appealed her termination and requested the factual basis for her termination via email.

44.    On or about January 10, 2019, Plaintiff's attorney, after receiving no response to his email on or about December 19, 2018, emailed the Defendant again requesting an appeal hearing and the factual basis for her termination.

45.    On or about January 23, 2019, Plaintiff received a letter, allegedly from Chief Moutray, who at the time was suspended himself, that detailed the allegations the Defendant used to terminate Plaintiff's employment. The letter listed three years of instances where Plaintiff allegedly exhibited insubordinate behavior, many of which she was never made aware of.

46.    On or about March 25, 2019, Plaintiff's attorney, again, emailed the Defendant requesting an appeal hearing.

47.    On or about April 15, 2019, Defendant held Plaintiff's appeal hearing.

48.    On or about May 17, 2019, Defendant, via a letter identical to Chief Moutray's

8

letter from January 23, 2019 affirmed Plaintiff's termination based on the original charges. The

May 17, 2019 correspondence was allegedly written by Capt. Miller.

49.     On or about June 12, 2019, Plaintiff filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") claiming that Defendant discriminated against

her based on her sex by treating her differently than similarly situated male employees.

50.     On or about July 18, 2019, Plaintiff, through legal counsel, requested her Notice of

Right to Sue Letter from the EEOC.

51.     Subsequent to Plaintiff's termination by Defendant, she was hired as a police officer

by the City of Herculaneum (on or around January 30, 2019). The City of Herculaneum uses the

City of Pevely Police Department facilities for their jail. Previously, Herculaneum officers were

given access to the Pevely Department's facilities. Upon Plaintiff's hire by Herculaneum, the City

of Pevely denied all access to all of the Herculaneum officers until September 19, 2019. On or

about that date, the City of Pevely gave full access back to all of the Herculaneum police officers

but continues to restrict the access of Plaintiff.

52.     On or about October 22, 2019, the EEOC issued its Notice of Right to Sue through

the United States Department of Justice, Civil Rights Division.

53.     This action has been filed within ninety (90) days of the issuance of the Notice of

Right to Sue.

### COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E *ET SEQ.*

COMES NOW Plaintiff, and for Count I of her Complaint, states as follows:

54.     Plaintiff, repleads and incorporates herein by reference, as if more fully set forth,

each and every allegation set forth in the Common Factual Allegations aforementioned as

Paragraph 54 of Count I.

55.     Plaintiff is female and, at all times relevant herein, was performing her job at a level that met or exceeded her employer's legitimate expectations.

56.     Plaintiff suffered an adverse employment action when Defendant denied Plaintiff a take home car.

57.     Plaintiff suffered an adverse employment action when Defendant denied Plaintiff from working a traffic grant.

58.     Plaintiff suffered discrimination due to her sex and pregnancy, which culminated in her termination.

59.     Defendant engaged in unlawful employment practices in violation of 42 U.S.C. §2000e-2(a)(1), by terminating Plaintiff because of her sex.

60.     The effect of Defendant's unlawful employment practices was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee, because of her sex.

61.     Defendant's unlawful employment practices were intentional and done with malice and with reckless indifference to Plaintiff's rights.

62.     Plaintiff's sex and pregnancy were motivating factors to Defendant's discrimination toward Plaintiff.

63.     As a direct result of Defendant's unlawful discrimination, Plaintiff has been damaged in the form of lost wages and benefits of employment, emotional distress, and humiliation.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor against Defendant for lost wages and other benefits of employment, compensatory damages, punitive

damages, prejudgment interest, attorneys' fees and costs, and for such additional relief as may be

just and proper under the circumstances.


Respectfully submitted,

THE KLOEPPEL LAW FIRM and THE LAW
OFFICES OF DANIELLE THOMPSON, LLC


By:     /s/ *Gregory Kloeppel*
        GREGORY KLOEPPEL, #47909MO
        DANIELLE THOMPSON, #61688MO
        2110 Collier Corporate Parkway
        St. Charles, MO 63303
        Phone: (636) 757-3916
        Fax: (636) 757-3918
        greg.kloeppel@mofop15.org
        danielle.thompson@mofop15.org

        *Attorneys for Plaintiff*